```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                        :
BARBARIAN RUGBY WORLD, INC.,                                            :
                                                                        :
                           Plaintiff,                                   :     06 Civ. 2652 (JGK) (DF)
                                                                        :
         -against-                                                      :     REPORT AND
                                                                        :     RECOMMENDATION
PRL USA HOLDINGS, INC.,                                                 :
                                                                        :
                           Defendant.                                   :
------------------------------------------------------------------------X
```

**TO THE HONORABLE JOHN G. KOELTL, U.S.D.J.:**

This matter is before the Court on a motion by defendant PRL USA Holdings, Inc. ("PRL") to enforce its purported out-of-court settlement agreement with plaintiff Barbarian Rugby World, Inc. ("Barbarian"). For the reasons set forth below, I recommend that the motion (Dkt. 84) be denied.

## BACKGROUND

The parties' submissions set forth the entire history of their settlement negotiations, but only a few of the facts regarding those negotiations bear noting here. First, there is no question that, for much of the discussions, Barbarian was a reluctant participant. It is fair to say that both PRL and the Court spent a fair amount of time bringing Barbarian to the table and keeping it engaged in talks. At an initial settlement conference held by the Court on August 13, 2007, Barbarian made plain that it did not believe that any settlement talks would be fruitful, given the significant differences between the parties in their views as to what would constitute a reasonable resolution of the action. Barbarian's position was that any settlement would need to have two components: (1) an agreement between the parties that would permit Barbarian to continue to operate its existing business as it saw fit, and (2) a monetary payment by PRL to

compensate Barbarian for at least some portion of its claimed damages and/or the attorneys' fees it had incurred in defending its trademark rights against PRL in both the United States Patent and Trademark Office and this Court. While PRL was willing to discuss an agreement that would protect each party's ability to engage in certain business activities, it showed no willingness to compensate Barbarian for either alleged damages or attorneys' fees. It was principally for this reason that Barbarian was initially unwilling to engage in settlement discussions at all.

At the Court's urging, however, Barbarian agreed at the August 2007 settlement conference to table its monetary demand and focus, in the first instance, on the terms of a potential "co-existence" agreement between the parties. In the months that then followed, after much ado and a number of false starts and detours, the parties actually managed to agree to the terms of such an agreement. The final draft settlement agreement exchanged by counsel incorporated a co-existence agreement, and there appears to be no dispute that, by at least April 2008, both parties had expressed their willingness to accept the negotiated terms under which their businesses could "co-exist." (*See* Declaration of G. Roxanne Elings in Support of Defendant PRL USA Holdings, Inc.'s Motion To Enforce Settlement Agreement, dated July 10, 2008 ("Elings Decl.") (Dkt. 86), Ex. W (e-mail to Roxanne Elings, Esq., from Barbara L. Waite, Esq., dated Apr. 9, 2008).) There also appears to be no dispute that, during the entire period of counsel's negotiations – from the date of the settlement conference before the Court to the date of the final draft agreement they exchanged – they did not discuss the issue of any potential monetary payment to Barbarian. Instead, that issue remained well and truly tabled. (*See generally* Elings Decl., Exs. M- U.)

PRL now takes the position that the final written agreement exchanged by counsel was, on its face, intended to be an integrated document that would manifest the entire settlement

2

agreement between the parties. Thus, PRL argues that, when Barbarian's counsel represented that the document, as drafted, was "acceptable" to Barbarian, this meant that Barbarian was effectively agreeing to abandon any claim it had for damages or attorneys' fees. (*See* Defendants' Memorandum of Law in Support of Its Motion To Enforce Settlement Agreement, dated July 10, 2008 (Dkt. 85), at 15-17.) Barbarian, however, states that it was only willing to accept of the terms of the negotiated *co-existence* agreement, that its counsel made this clear, and that its stated position did not represent any willingness on its part to forego a monetary payment as part of an overall settlement. (*See* Memorandum of Points and Authorities in Opposition to PRL USA Holdings, Inc.'s Motion To Enforce Settlement Agreement, dated July 23, 2008 (Dkt. 88), at 3, 6.) According to Barbarian, despite the progress made by the parties with respect to a co-existence agreement, the parties never had a meeting of the minds as to whether a settlement should also include a monetary payment, and thus there is no enforceable settlement agreement. (*See generally id.*)

## DISCUSSION

A "'district court has the power to enforce summarily, on motion, a settlement agreement reached in a case that was pending before it.'" *Cruz v. Korean Air Lines* Co., 838 F. Supp. 843, 845 (S.D.N.Y. 1993) (quoting *Meetings & Expositions, Inc. v. Tandy Corp.*, 490 F.2d 714, 717 (2d Cir. 1974)). A party seeking to enforce a purported settlement agreement has the burden of proof to demonstrate that the parties actually entered into such an agreement. *See Lightwave Techs., Inc. v. Corning Glass Works*, 725 F. Supp. 198, 200 (S.D.N.Y. 1989).

A settlement agreement is a contract, and, to form a valid contract, there must be an offer, acceptance, consideration, mutual assent and intent to be bound. *See, e.g., Register.com,*

*Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) (applying New York law).[1]  "[T]he fundamental basis of a valid, enforceable contract is a meeting of the minds of the parties," and, "if there is no meeting of the minds on all essential terms, there is no contract." *Schurr v. Austin Galleries of Ill., Inc.*, 719 F.2d 571, 576 (2d Cir. 1983) (citations omitted).  Whether there has been a meeting of the minds on all essential terms is a question of fact that must be resolved by analyzing the totality of the circumstances.  *See United States v. Sforza*, 326 F.3d 107, 116 (2d Cir. 2003).

In determining whether an oral or unsigned agreement between the parties is binding, the Court may consider a number of factors, including:

> (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

*Winston v. Mediafare Ent. Corp.,* 777 F.2d 78, 80 (2d Cir. 1985).  But, despite any multi-factor inquiry, if the Court finds substantial ambiguity regarding whether both parties have mutually assented to all material terms, then the Court can neither find, nor enforce, a contract.  *See Schurr*, 719 F.2d at 576; *see also Missigman v. USI Northeast, Inc.*, 131 F. Supp. 2d 495, 506 (S.D.N.Y. 2001) ("If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract."); *Express Industry and Terminal Corp. v. New York State Dep't of*

---

[1] The parties to this case have not explicitly argued that New York law should apply to the question of whether they reached an enforceable settlement agreement, but they have cited cases that rely on New York law, and their draft settlement agreement itself indicates that it is to be governed by New York law. (*See* Elings Decl., Ex. U (Agreement), at ¶ 6.)  In any event, there is no material difference between New York law and federal common law, with respect to the standards for contract formation.  *See Ciaramella v. Reader's Digest Ass'n, Inc.,* 131 F.3d 320, 322 (2d Cir. 1997).

*Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999) ("To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." (citation omitted)).

In this case, the critical question, on which PRL bears the burden of proof, is whether Barbarian manifested its assent to be bound by the terms of the last draft settlement agreement that was exchanged by counsel, but never signed. In this Court's view, PRL has not met that burden, as it has not demonstrated that Barbarian ever intended to be bound by a settlement agreement that did not include the component of a monetary payment.

Merely because the parties did not discuss the issue of a monetary component for a substantial period of time does not mean that the issue was necessarily abandoned by Barbarian, especially as the Court itself had suggested that the issue be set aside while the parties determined if they could reach agreement as to a co-existence agreement. Further, although Barbarian's own counsel ultimately proposed a draft settlement agreement that did not include any provision for a monetary payment, she nonetheless made it clear to opposing counsel that she was doing so without any promise that her client would accept that proposal. Indeed, when PRL's counsel inquired of Barbarian's counsel, via e-mail, as to whether she had even "discussed the general terms" of the proposed settlement with her client, Barbarian's counsel responded that she had not, adding:

> Frankly, I believed it better to reach a conclusion as between us and THEN present it to my client, rather than risk the entire deal falling apart again over something inadvertent. That is why I was going to try to finalize a document that you and I could agree accurately represented our discussions before presenting it to my client.

(Elings Decl., Ex. S (e-mail to Roxanne Elings, Esq., from Barbara L Waite, Esq. dated Nov. 27, 2007).)

On December 5, 2007, Barbarian's counsel advised PRL that she had forwarded the final draft settlement to her client "with [her] recommendations," indicating that she would "advise when [she had] instructions." (*Id.,* Ex. U (e-mail to Roxanne Elings, Esq., from Barbara L Waite, Esq. dated Dec. 5, 2007).) On January 17, 2008, PRL's counsel inquired whether there was "any news" (*id.,* Ex. V (e-mail to Barbara L. Waite, Esq. from Roxanne Elings, Esq., dated Jan. 17, 2008)), and, on January 22, 2008, Barbarian's counsel responded that her client would be unavailable until January 28th (*id.* (e-mail to Roxanne Elings, Esq., from Barbara L. Waite, Esq., dated Jan. 22, 2008)). While Barbarian's counsel added that "the last word to me was that the document is acceptable to them," she further noted that "[t]hey are pondering the issue of their damages claim." (*Id*.)

More than two months later, PRL's counsel again inquired as to whether there was any news on settlement, specifically writing: "It has been some time since I have heard from you concerning settlement. Please let me know at your soonest." (*Id.,* Ex. W (e-mail to Barbara L. Waite, Esq., from Roxanne Elings, Esq., dated Apr. 2, 2008).) Barbarian's counsel then responded:

> I have consulted further with my client, and their position has not changed with respect to the Coexistence Agreement. It is acceptable.
>
> The problem, however, is that my client, as you know, is nowhere near the size of yours. Attorneys fees in the amount of $203,682.66, which is the current tab to date, are not something they are able to come to terms with absorbing.

(*Id.* (e-mail to Roxanne Elings, Esq., from Barbara L. Waite, Esq., dated Apr. 9, 2008).)

This trail of e-mail communications strongly suggests that, although Barbarian's counsel may have recommended to her client a settlement comprised solely of a co-existence agreement, Barbarian did not accept any such recommendation, maintaining instead its original position that any settlement needed to include a monetary component.  Although, in January 2008, Barbarian's counsel indicated that her client had found the draft settlement "document" (arguably referring to the entire agreement) to be "acceptable" (Elings Decl., Ex. V) counsel's juxtaposition of that statement with the further comment that her client was "pondering the issue of [its] damages claim" (*id*.) raises at least a substantial ambiguity as to whether Barbarian was prepared to accept the draft agreement, in the absence of compensation for its claimed damages. In any event, PRL apparently acknowledged that it had not yet received a firm answer from Barbarian, when its counsel inquired again in April 2008 about the status of the proposed settlement.  At that time, Barbarian's unequivocal response was that it found the "Coexistence Agreement" to be acceptable, but that it was not prepared to accept a settlement that would require it to absorb all of its attorneys fees.  (*Id.,* Ex. W.)

On this record, this Court cannot conclude that Barbarian ever manifest its agreement to be bound by a settlement agreement that did not provide for a monetary payment from PRL.  As the inclusion or exclusion of a monetary payment would have been a material term to the parties' settlement, and as the Court cannot enforce a settlement agreement where the moving party has failed to show the unambiguous assent by both parties to all of the agreement's material terms, I recommend that PRL's motion to enforce the purported agreement between the parties be denied.

## CONCLUSION

For all of the foregoing reasons, I respectfully recommend that the Court deny PRL's motion (Dkt. 84) to enforce the purported settlement agreement between the parties.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable John G. Koeltl, United States Courthouse, 500 Pearl Street, Room 1030, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 525, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Koeltl. FAILURE TO FILE OBJECTIONS WITHIN TEN (10) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:  New York, New York
        November 18, 2008

RESPECTFULLY SUBMITTED,

_____
DEBRA FREEMAN
United States Magistrate Judge

Copies to:

Hon. John G. Koeltl, U.S.D.J.

all counsel (via ECF)